UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GREGORY J. REED *et al.*,

      Appellants,

v.

KENNETH A. NATHAN

      Appellee.

_____/

Case No. 15-cv-14462
Hon. Matthew F. Leitman

## AMENDED[1] OPINION AND ORDER AFFIRMING BANKRUPTCY COURT'S JANUARY 4, 2016, AMENDED ORDER REQUIRING TURNOVER OF ASSETS

In 1996, Debtor-Appellant Gregory Reed ("Reed") and two other individuals established Appellant Keeper of the Word Foundation ("KWF") to purchase and preserve documents of historical significance. While Reed's intentions were laudable, his operation of KWF's finances was not. For many years, Reed comingled his personal assets with those of KWF in order to shield his assets from his many creditors, used assets that supposedly belonged to KWF for his own purposes, and treated KWF as his personal "piggy bank."

---

[1] This Amended Opinion makes no substantive changes to the Court's original Opinion and Order. The only changes from the original version are (1) the addition of the full and correct citation to an article by Professor Ralph Brubaker (on pages 14, 23, and 33 below) and (2) the elimination of a pronoun and redundant parenthetical (on page 14 below).

In 2014, Reed filed for personal bankruptcy under Chapter 7 of the Bankruptcy Code (the "Bankruptcy Proceeding"). The Bankruptcy Court appointed Appellee Kenneth Nathan (the "Trustee") as the Trustee of Reed's bankruptcy estate (the "Estate"). During the course of the Bankruptcy Proceeding, the Trustee filed a motion seeking an order that required KWF to turn over assets that it claimed to own (the "Turnover Motion"). The Trustee alleged that the assets in question were, in fact, assets of the Estate. The Bankruptcy Court held several days of hearings on the Turnover Motion, concluded that nearly all of the assets in dispute did belong to the Estate, and entered a final order that required KWF to turn over the bulk of these assets to the Trustee (the "Final Turnover Order").[2]

In this appeal, Reed and KWF urge the Court to vacate the Final Turnover Order. They argue that (1) the Bankruptcy Court lacked jurisdiction to enter the Final Turnover Order; (2) the Bankruptcy Court erred by adjudicating the turnover proceedings in the context of a contested motion rather than in an adversary proceeding; and (3) the Bankruptcy Court deprived KWF of its Seventh Amendment right to a jury trial. The Court disagrees.

---

[2] The Bankruptcy Court entered both a written opinion and a separate final order on December 17, 2015. (*See* Bankruptcy Proceeding Dkt. ## 344, 345.) The final order was amended to correct a clerical error on January 4, 2016. (*See id.* at Dkt. #362.) The Court will refer to these three documents collectively as the "Final Turnover Order."

The Bankruptcy Court did precisely what it had to do in order to properly administer the Estate. And it did what bankruptcy commissioners, referees, and judges have been doing with Supreme Court approval for well over seventy-five years. The Bankruptcy Court did not exceed its statutory jurisdiction, violate Article III of, or the Seventh Amendment to, the United States Constitution, or cause KWF any cognizable prejudice. Accordingly, for the reasons explained in detail below, the Court **AFFIRMS** the Final Turnover Order.

## I

Reed is a licensed attorney who lives in Detroit, Michigan. (Final Turnover Order, Bankruptcy Proceeding Dkt. #344 at 2, citing 11/2/2015 Hearing Tr., Bankruptcy Proceeding Dkt. #296 at 21-22, 52.) "In the early 1990's, [] Reed became interested in purchasing documents and writings which he believed to have historical significance." (*Id.* at 3.) In 1996, Reed and two other individuals incorporated KWF as a non-profit organization in order "to collect and preserve records, relics, and other things of historical interest" such as "papers, memoirs, and memorabilia." (KWF Articles of Incorporation, Bankruptcy Proceeding Dkt. #167 at Ex. 2.) "Since at least 2012, Reed has had sole control over the financial affairs of KWF." (Final Turnover Order, Bankruptcy Proceeding Dkt. #344 at 27, citing 10/7/2015 Hearing Tr., Bankruptcy Proceeding Dkt. #257 at 118-120 and KWF Trial Exhibit 1, Bankruptcy Proceeding Dkt. ## 195-1 – 195-7.)

On August 28, 2014, Reed filed the Bankruptcy Proceeding.[3] (*See* Bankruptcy Proceeding, Dkt. #1.) On February 27, 2015, the Trustee initiated a related adversary proceeding in the Bankruptcy Court against KWF and five other Defendants (the "Adversary Proceeding").[4] (*See* Adversary Proceeding, Dkt. #1.) The Trustee's First Amended Complaint in the Adversary Proceeding alleged that Reed fraudulently conveyed certain real and personal property to KWF "for the purpose of defrauding Reed's creditors." (First. Am. Compl., Adversary Proceeding Dkt. #50 at 2.) The Trustee sought "a judgment avoiding and recovering the property transferred [to KWF] in the Fraudulent Transfers, or the value thereof, from [KWF] for the benefit of the [] Estate." (*Id.* at 19-20.)

KWF filed a motion to dismiss the First Amended Complaint on March 30, 2015. (*See* Adversary Proceeding Dkt. #21.) It also demanded a jury trial on the claims raised in the First Amended Complaint. (*See* Adversary Proceeding Dkt. #25.) Finally, KWF filed a motion to withdraw the reference to the Bankruptcy Court and requested that the claims in the First Amended Complaint be adjudicated in district court. (*See* Adversary Proceeding Dkt. #65.)

---

[3] The Bankruptcy Proceeding was assigned Bankruptcy Court case number 14-53838.

[4] The related Adversary Proceeding was assigned Bankruptcy Court case number 15-04192. Adversary proceedings are described in more detail in section VII(A) below.

During the initial phases of the Adversary Proceeding, the Trustee came to believe that many of the assets that were the subject of the fraudulent transfer claim actually belonged to Reed.  The Trustee then changed his approach.  Instead of seeking to obtain the assets through the fraudulent conveyance claim in the Adversary Proceeding, the Trustee attempted to acquire the assets by filing the Turnover Motion in the underlying Bankruptcy Proceeding.[5]   In the Turnover Motion, the Trustee sought an order to compel KWF to surrender "[a]ny and all [of its] assets" (hereinafter, the "Turnover Assets"). (*See* Bankruptcy Proceeding Dkt. #149 at 1-2.)  The Trustee filed the Turnover Motion under 11 U.S.C. § 542(a) ("Section 542(a)"), a statute that requires an entity "in possession, custody, or control" of property belonging to a bankruptcy estate to "deliver" that property to the estate's trustee "unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a).  KWF filed a response to the Turnover Motion on July 6, 2015. (*See* Bankruptcy Proceeding Dkt. #167.)

The Bankruptcy Court held an initial hearing on the Turnover Motion on July 21, 2015.  The court heard legal arguments from counsel at that hearing but did not take testimony.  "At the conclusion of the hearing, the [Bankruptcy] Court issued a preliminary ruling that there were already pleadings in the record from

---

[5] On May 5, 2015, the Bankruptcy Court stayed the Adversary Proceeding. (*See* Adversary Proceeding Dkt. #69.)  The Adversary Proceeding remains stayed as of this date of this Opinion and Order.

which the [c]ourt could conclude" that some of the property in question belonged to the Estate. (Final Turnover Order, Bankruptcy Proceeding Dkt. #344 at 14.)

The Bankruptcy Court then scheduled an evidentiary hearing to determine "whether any of the assets held by KWF, or allegedly held by KWF [i.e., the Turnover Assets], were property of the [] [E]state." (*Id.*)  The parties took vastly different positions on that issue.  KWF acknowledged that Reed had once owned some of the Turnover Assets, but it insisted that it lawfully acquired those assets in 2004 when Reed assigned all of his property to KWF (the "Purported Assignment").  KWF further argued that the Turnover Assets should not be deemed part of the Estate because it (KWF) had a truly separate existence from Reed.  The Trustee countered that that the Turnover Assets belonged to the Estate because Reed had extensively comingled his assets and personal financial affairs with those of KWF.

The Bankruptcy Court conducted the evidentiary hearing over three days in the Fall of 2015.  During this hearing, the Bankruptcy Court allowed the Trustee and KWF to examine witnesses, introduce evidence, and present legal argument.  At the conclusion of the evidentiary hearing, the Bankruptcy Court allowed each party to file a post-hearing brief.

On December 17, 2015, the Bankruptcy Court entered the Final Turnover Order and held that the Turnover Assets were part of the Estate. (*See* Final

Turnover Order, Bankruptcy Proceeding Dkt. ## 344, 345.)  In its decision, the Bankruptcy Court addressed KWF's claims that it owned the Turnover Assets by virtue of the Purported Assignment and its claimed separate existence from Reed. The court determined that notwithstanding the Purported Assignment and KWF's formal legal status as an independent entity, the Turnover Assets were properly considered part of the Estate because Reed had comprehensively comingled his financial affairs with those of KWF and had maintained control of assets that supposedly belonged to KWF. (*See* Final Turnover Order, Bankruptcy Proceeding Dkt. #344 at 31-32.)  The court highlighted many examples of Reed comingling his financial affairs with those of KWF, maintaining control over KWF's purported assets, or both:

- While KWF claimed to own a personal residence on Burns Street in Detroit where Reed lived (the "Burns Property"), title to the Burns Property was always in Reed's name. (*See* Final Turnover Order, Bankruptcy Proceeding Dkt. #344 at 24.)  Moreover, Reed granted a mortgage on the Burns Property as security for a loan to him *personally* and deducted from his *personal* tax obligations the property taxes paid on that property. (*See id.*)

- In August 2013, Reed sold books belonging to KWF to Glen Horowitz Bookseller, Inc. for $15,000, and Reed had that money deposited into a KWF checking account. (*See id.*)  Reed then used those funds "to pay [his] personal expenses." (*Id.*)

- "[P]ayments for the sale of [other] books by KWF were deposited into a KWF bank account and then used to pay [Reed's] personal expenses." (*Id.* at 26.)

- In March 2014, "Reed sold a letter from Martin Luther King to Rosa Parks" for $65,000. (*Id.* at 25-26.)  Reed "testified that the letter came from the inventory of the [KWF]," but bank statements established that the funds from the sale of the letter "were used to pay Mr. Reed's personal expenses, specifically his mortgage, his car payment, his utility bills, and his credit card bills." (*Id.* at 26; internal quotation marks omitted.)

- Reed had his Social Security income deposited into KWF bank accounts and then used those accounts "to pay all, or most of, his personal expenses, including the mortgage on the Burns Property, utilities, credit cards, and [his] Lexus car payment." (*Id.* at 27-28.)

- In 2014, Reed settled a civil lawsuit to which KWF was not a party, had settlement funds owed to him "deposited in a KWF bank account," and he then used those funds "either to benefit himself or to pay [his] preferred creditors." (*Id.* at 30.)

- Reed "has *always* maintained [personal] control of the memorabilia he has collected [in KWF's name] over the years, and has used it to generate revenue for himself, not for the benefit of KWF." (*Id.* at 25; emphasis added.)

- Reed hid from the Trustee assets that KWF was required to produce for inspection. (*See id.*)

- "Reed's control of the finances of KWF made it possible for Reed to use KWF's bank accounts as his own." (*Id.* at 31.)

- Finally, Reed caused KWF to execute a promissory note as security for a $110,000 loan even though the borrowed funds were "used for some other purpose than to benefit KWF." (*Id.* at 28-29.)

From this evidence, the Bankruptcy Court determined that Reed "used KWF as his personal piggy bank" and had "comingled his financial affairs with those of KWF to the point where [he] treat[ed] all of KWF's assets as his own." (*Id.* at 31-32.) The court therefore held that the Turnover Assets were properly deemed property of the Estate. (*See id.* at 32.)

The Bankruptcy Court entered the Final Turnover Order on December 17, 2015. (*See* Bankruptcy Proceeding at Dkt. ## 344, 345.)  KWF timely filed its appeal of the Final Turnover Order in this Court on December 28, 2015. (*See* ECF #1.)

## II

A federal district court has jurisdiction to hear appeals – and an aggrieved litigant may appeal as of right – from "final judgments, orders, and decrees" of a bankruptcy court. 28 U.S.C. § 158(a)(1). The Court reviews the Bankruptcy Court's legal conclusions *de novo* and its findings of fact for clear error. *See In re Dilworth*, 560 F.3d 562, 563 (6th Cir. 2009).  "On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013.

9

## III

## A

"The only way to fully comprehend federal bankruptcy jurisdiction – including the current assignment of adjudicatory authority to non-Article III bankruptcy judges – is to understand the history of federal bankruptcy jurisdiction." Ralph Brubaker, *A 'Summary' Statutory and Constitutional Theory of Bankruptcy Judges' Core Jurisdiction After Stern v. Marshall*, 86 Amer. Bankr. L.J. 121, 122 (2012).[6]  That history is an important guidepost in assessing the limits of bankruptcy court jurisdiction because the Supreme Court has "offered no comprehensive rule for application across all cases." *In re Renewable Energy Dev. Corp.*, 792 F.3d 1274, 1279-80 (10th Cir. 2015).

Consulting the parameters of bankruptcy court jurisdiction that prevailed under the Bankruptcy Act of 1898 (the "1898 Act") is especially helpful in delineating the limits of modern bankruptcy court jurisdiction.  Justices of the

---

[6] Throughout this Opinion and Order, the Court cites the work of noted bankruptcy scholar Ralph Brubaker ("Professor Brubaker"), the Carl L. Vacketta Professor of Law at the University of Illinois College of Law.  The Supreme Court has cited Professor Brubaker's bankruptcy scholarship with approval on more than one occasion. *See, e.g., Wellness Intern. Network, Ltd. v. Sharif*, __ U.S. __, 135 S.Ct. 1932, 1942 (2015) (quoting Ralph Brubaker, *The Constitutionality of Litigant Consent to Non-Article III Bankruptcy Adjudications*, 32 Bankr. L. Letter No. 12, at 1, 6 (Dec. 2012)); *Executive Benefits Ins. Agency v. Arkison*, 573 U.S. __, 134 S.Ct. 2165, 2170 (2014) (citing Brubaker, 86 Am. Bankr. L.J. at 124, 128).  The Court wishes to thank Professor Brubaker for the informative amicus brief that he submitted in this action at the Court's request. (*See* ECF #34.)

Supreme Court and leading bankruptcy scholars have recently drawn upon those parameters as they have wrestled with the extent to which Article III of the United States Constitution limits modern bankruptcy court jurisdiction. *See, e.g.*, *Wellness Intern. Network, Ltd. v. Sharif*, __ U.S. __, 135 S.Ct. 1932, 1952-54 (2015) (Roberts, C.J. dissenting[7]); *id*. at 1967-68 (Thomas, J., dissenting); Brubaker, 86 Amer. Bankr. L. J. at 122.   And they have suggested that Article III does not limit a modern bankruptcy court's jurisdiction to enter a final order in a matter that would have fallen within the historical summary jurisdiction of bankruptcy courts. *See Sharif*, 135 S.Ct. at 1952-54 (Roberts, C.J., dissenting); Brubaker, 86 Amer. Bankr. L. J. at 122.

The practice under the 1898 Act also sheds important light on the statutory jurisdiction of modern bankruptcy courts to enter final orders.   The Supreme Court "will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure." *Hamilton v. Lanning*,

---

[7] This Opinion and Order draws extensively upon the Chief Justice's Opinion *Sharif*.  Importantly, while that Opinion is designated as a dissenting Opinion, the majority in *Sharif* neither addressed nor disagreed with the portions of the Chief Justice's Opinion discussed above.   More specifically, this Opinion and Order draws heavily upon Section IA of the Chief Justice's Opinion in *Sharif*.  In that Section, the Chief Justice opined that Article III of the United States Constitution did not prohibit a bankruptcy judge from entering a final order on the claim at issue in that case. *See Sharif*, 135 S.Ct. at 1950-1955 (Roberts, C.J. dissenting).   The majority expressly declined to address that issue. *See id.* at 1942 n.7.  Instead, the majority addressed only whether the parties could validly consent to have a bankruptcy court adjudicate the claim. *See id*. at 1942-48.

560 U.S. 505, 517 (2010), and as explained below, Congress gave no "clear indication" in the Code that it intended to subtract from the historical jurisdiction bankruptcy courts have long enjoyed. On the contrary, Congress' objective is to "giv[e] bankruptcy courts as much core jurisdiction as is constitutionally permissible." Brubaker, 86 Am. Bankr. L.J. at 124, 128.

To be sure, under current Supreme Court precedent, questions of modern bankruptcy court jurisdiction generally – and the specific jurisdictional questions currently before this Court – cannot be answered *solely* by looking to past practice. But in trying to understand whether a bankruptcy court exceeded its jurisdiction in entering a particular final order, it makes good sense to begin by determining whether the challenged order would have fallen with the historical jurisdiction of bankruptcy courts to enter final orders. So this Court begins with that question as it wrestles with the ultimate inquiry of whether the Bankruptcy Court lacked jurisdiction to enter the Final Turnover Order.

**B**

"At its most basic level, bankruptcy is 'an adjudication of interests claimed in a res,'" and in order to adjudicate those interests, a bankruptcy court must first determine the parameters of the res. *Sharif*, 135 S.Ct. at 1952 (Roberts, C.J. dissenting) (quoting *Katchen v. Landy*, 382 U.S. 323, 329 (1966)). Indeed, "[d]efining what constitutes the estate is the necessary starting point of every

12

bankruptcy; a court cannot divide up the estate without first knowing what's in it." *Id.* That is precisely why "[i]dentifying property that constitutes the estate has long been a central feature of bankruptcy adjudication." *Id.* (discussing the historical authority of English bankruptcy commissioners).

But bankruptcy courts have not had unlimited authority to determine that property belongs to a bankruptcy estate. The extent of their power to bring property within the estate has turned, in large part, on whether the property was in the actual or constructive possession of the debtor – and thus the bankruptcy court[8] – at the time the debtor filed for bankruptcy. Where the debtor did possess the property, the bankruptcy courts have been permitted to adjudicate *all* disputes concerning title to the property – including claims of ownership by third parties – and to order that the property be surrendered to the estate.

The practice under the 1898 Act illustrates these broad historical powers of bankruptcy courts. Under that Act, "bankruptcy referees had authority to exercise 'summary' jurisdiction over certain claims, while other claims could only be

---

[8] *See, e.g.*, *Ex parte Baldwin*, 291 U.S. 610, 615 (1934) ("All property *in the possession of a bankrupt* of which he claims the ownership passes, upon the filing of a petition in bankruptcy, into the custody of the court of bankruptcy") (emphasis added); *In re Ellis*, 674 F.2d 1238, 1251 (9th Cir. 1982) ("Upon filing of [a] bankruptcy petition, [] property [of bankruptcy debtor] passe[s] into the custody of the bankruptcy court, which then ha[s] jurisdiction to determine controversies concerning the property"); *In Re Higbee Co.*, 88 F.Supp. 751, 752 (N.D. Ohio 1950) (explaining that a bankruptcy "court has actual or constructive possession over all property which at the time of the filing of the [bankruptcy] petition was in the actual or constructive possession of the bankrupt").

adjudicated in 'plenary' proceedings before an Article III district court." *Id*. (citing *Executive Benefits Ins. Agency v. Arkison*, 573 U.S. __,   134 S.Ct. 2165, 2170 (2014)).  A bankruptcy referee's summary jurisdiction under the 1898 Act included the "power … to adjudicate, without consent, controversies concerning the title to property of which [the court] had possession." *Taubel-Scott-Kitzmiller Co. v. Fox*, 264 U.S. 426, 432–33 (1924).  Stated another way, "if the property were in the custody of the bankruptcy court or its officer, *any controversy raised by an adverse claimant setting up a title to or lien upon it* might be determined on summary proceedings in the bankruptcy court, and would fall within the jurisdiction of the referee." *Weidhorn v. Levy*, 253 U.S. 268, 271-72 (1920) (emphasis added).

The possession that gave rise to a bankruptcy court's broad summary jurisdiction did "not" have "to be actual." *Id*.  "Constructive possession [was] sufficient." *Id*.  And such possession "exist[ed]" in a number of circumstances, including, where the debtor had "control" over the property at that time. *Weidhorn*, 253 U.S. at 271-72 (internal citations omitted) (bankruptcy court did not have actual or constructive possession over property which would have given rise to summary jurisdiction because debtor did not have "possession or control" over property").[9]

---

[9] *See also* Ralph Brubaker, *The Constitutionality of Non-Article III Bankruptcy Adjudications, With and Without Litigant Consent (Part III)*, 36 Bankr. L. Letter No. 1, at 1, 7-8 (Jan. 2016) (noting that the Supreme Court "often phrased the

Under limited circumstances, a bankruptcy court was even deemed to have constructive possession of – and thus summary jurisdiction over – property held by a third party.  Such constructive possession existed where the debtor's estate had a claim to the property and where third party's "claim [to the property was] colorable only." *Taubel-Scott-Kitzmiller Co.* 264 U.S. at 432-33.  Constructive possession did not exist where the third party in possession raised a "substantial adverse" claim to the property. *In re Wiltse Bros. Corp.*, 357 F.2d 190, 193 (6th Cir. 1966) ("General principles establish that where the actual or constructive possession is in a third person, the Bankruptcy Court only has jurisdiction when it determines that the property is not held under a substantial adverse claim").

Importantly, bankruptcy courts retained jurisdiction to determine whether a third party raised a merely "colorable" claim to property (in which case the bankruptcy court had constructive possession of the property and summary jurisdiction to resolve competing claims to it) or a "substantial adverse" claim (in which case the bankruptcy court lacked constructive possession and could not summarily decide claims with respect to that property).  As the Supreme Court explained, a bankruptcy court was empowered to "conclude, where it lack[ed] actual possession, that the physical possession held by some other persons [was] of

---

determinative inquiry [concerning whether the debtor, and thus the bankruptcy court, possessed property] in terms of whether the property at issue was "in possession *or control* of the court or of the bankrupt….") (Emphasis added.)

such a nature that the property [was] constructively within the possession of the court." *Taubel-Scott-Kitzmiller*, 264 U.S. at 434.   In other words, the Supreme Court reserved to the bankruptcy court "the power and the duty" to determine whether a third party's claim to property was a "substantial adverse" one or a "merely colorable" one. *Cline v. Kaplan*, 323 U.S. 97, 99 (1944).

In *Harrison v. Chamberlain*, 271 U.S. 191, 194-95 (1926), the Supreme Court provided bankruptcy courts with "the test to be applied in determining whether an adverse claim is substantial or merely colorable."   Under this test, a third party's claim "is to be deemed of a substantial character when the claimant's contention discloses a contested matter of right, involving some fair doubt and reasonable room for controversy, in matters either of fact or law; and is not to be held merely colorable unless the preliminary inquiry shows that it is so unsubstantial and obviously insufficient, either in fact or law, as to be plainly without color of merit, and a mere pretense." *Id*. (quotation omitted).

## C

In *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215 (1941), the Supreme Court applied the above-described rules to determine whether a bankruptcy court had summary jurisdiction to declare that property titled to an affiliate of the debtor belonged to the debtor's bankruptcy estate.   *Sampsell* involved a debtor named Wilbur Downey ("Downey").   Prior to 1936, Downey

"had engaged in business, unincorporated, and had incurred a debt to the predecessor of Standard Coated Products Corporation of approximately $104,000." *Sampsell*, 313 U.S. at 215.   In June of 1936, Downey formed a corporation, transferred his personal stock to the corporation, and thereafter conducted business in the name of the corporation. *See id.*   In 1938, Downey "was adjudged a voluntary bankrupt," and during the bankruptcy proceedings, the assigned bankruptcy referee ordered Downey and the corporation to show cause "why the assets of the corporation should not be marshalled for the benefit of the creditors of the bankrupt estate and administered by the trustee." *Id*. at 216.  The referee held a hearing, found that the corporation was a mere "sham and a cloak" designed to preserve assets for Downey's family, and entered a final order declaring "that the property of the corporation was property of the bankrupt estate and that it be administered for the benefit of creditors." *Id*. at 217.

The Supreme Court held that there was "no question but that the jurisdiction of the bankruptcy court was properly exercised by summary proceedings." *Id*. at 218.  The court explained that a mere alter ego of the debtor is in no position to make a "substantial adverse" claim to property that would deprive a bankruptcy court of constructive possession – and thus summary jurisdiction – over the property under "the rule of *Taubel-Scott-Kitzmiller Co.* [*supra*]":

> The legal existence of the affiliated corporation does not per se give it standing to insist on a plenary suit.

> Mere legal paraphernalia will not suffice to transform into a substantial adverse claimant a corporation whose affairs are so closely assimilated to the affairs of the dominant stockholder that in substance it is little more than his corporate pocket. Whatever the full reach of that rule may be, it is clear that a family corporation's adverse claim is merely colorable where, as in this case, the corporation is formed in order to continue the bankrupt's business, where the bankrupt remains in control, and where the effect of the transfer is to hinder, delay, or defraud his creditors. Hence, Downey's corporation was in no position to assert against Downey's trustee that it was so separate and insulated from Downey's other business affairs as to stand in an independent and adverse position.

*Id*. at 218. *Sampsell* exemplifies the historical authority of bankruptcy courts to exercise summary jurisdiction over a "claim that the debtor had concealed assets under the veil of a corporate entity that was" his mere alter ego. *Sharif*, 135 S.Ct. at 1953 (Roberts, C.J., dissenting) (describing *Sampsell*).

A long line of post-*Sampsell* circuit-level decisions confirm this historical power of bankruptcy courts. *See In re Cyberco Holdings, Inc.*, 431 B.R. 404, 417-18 (Bankr. W.D. Mich. 2010) (collecting cases). The decision of the United States Court of Appeals for the Second Circuit in *Soviero v. Franklin National Bank of Long Island*, 328 F.2d 446 (2d Cir. 1964), is the most significant of these decisions. *Soviero* involved the bankruptcy of a corporate debtor. The bankruptcy trustee "sought an adjudication [from a bankruptcy referee] that assets of thirteen separate corporations … in fact belonged to the bankrupt" on the ground that these

18

affiliated entities were mere alter egos of the debtor. *Id.* at 446-47.  A bank that held a lien against property titled to the affiliates disputed the alter ego allegations and also argued "that the [r]eferee in bankruptcy lacked jurisdiction to summarily adjudicate title to property adversely held without the instigation of a plenary suit." *Id.*  The referee overruled the objection, held a hearing on the alter ego issue, ruled that the affiliated entities were in fact alter egos of the debtor and that their assets should be treated as property of the estate, and entered a final order requiring the affiliates to turn their assets over the trustee. *See id.*  The bank appealed.

The Second Circuit held that the bankruptcy referee did not exceed its summary jurisdiction.  The court first identified the governing rules established by the Supreme Court precedent discussed above: (1) that a bankruptcy court or referee "has the power to adjudicate summarily rights and claims to property which is in the actual or constructive possession of the court," *id.* at 447 (quoting *Cline*, 323 U.S. at 98), and (2) that a bankruptcy court or referee "is deemed to have constructive possession where at the time of the filing of the petition in bankruptcy the property in question is held by one whose adverse claim lacks substance and is at best only colorable." *Id.*  The Second Circuit described its task as to "determine whether the adverse claims of corporate separateness presented such a fair doubt or a reasonable controversy as to render the [r]eferee's order piercing the corporate entities unjustified." *Id.*  The Second Circuit concluded that the evidence before the

19

referee amply established that the affiliates were mere alter egos of the debtor; that the affiliates' claims to the property were therefore "without color of merit, and a mere pretense;" and that "the [r]eferee's use of a summary proceeding was thus *entirely proper.*" *Id.* (emphasis added).

After deciding the jurisdictional issue, the Second Circuit then addressed whether the referee properly ordered the affiliates to turn over assets titled in their names. The court affirmed the turnover order and explained:

> Although we hold that the [r]eferee properly decided the preliminary jurisdictional issue, the question of the propriety of the issuance of the turnover order remains. A turnover order is a judicial innovation by which the court (of bankruptcy) seeks efficiently and expeditiously to accomplish ends prescribed by the statute. We cannot agree with the Bank's contention that the corporate veils may be pierced only where the [r]eferee finds that the subsidiary corporations were organized to defraud or hinder creditors. In *Stone v. Eacho,* 127 F.2d 284 (4th Cir.), cert. denied 317 U.S. 635, 63 S.Ct. 54, 87 L.ed. 512 (1942), where the facts closely resembled those of the instant case, the court affirmed the issuance of the turnover order, ignoring the corporate entity of a subsidiary corporation, for only then could all the creditors receive that equality of treatment which it is the purpose of the bankruptcy act to afford. A similar conclusion is fully warranted here.

*Id.* at 448-49 (quotations and citations omitted) (emphasis added).

*Soviero* "provides in a comprehensive opinion a textbook example of what had become a well established practice under the former [1898] Act of courts in bankruptcy permitting the involuntary seizure of another entity's assets through the

issuance of a turnover order so long as the bankruptcy trustee could establish that the targeted entity was merely the alter ego or instrumentality of the bankrupt debtor." *Cyberco Holdings*, 431 B.R. at 420.

## D

The Bankruptcy Court's entry of the Final Turnover Order was fully consistent with the historical exercise of summary bankruptcy jurisdiction described above. Under those historical standards, the Bankruptcy Court had summary jurisdiction to adjudicate title to the Turnover Assets and to require their surrender to the Trustee because it had constructive possession over the assets. It had constructive possession for two reasons.

First, the Bankruptcy Court had constructive possession over the Turnover Assets because KWF's claim to the assets was entirely baseless and, thus, merely "colorable." *See Taubel-Scott-Kitzmiller Co., supra* (bankruptcy court has constructive possession where claim of third party holding property is only "colorable"). Indeed, in this Court, KWF makes no real effort to substantiate its claim to title of the Turnover Assets. As described above, the Bankruptcy Court ruled that KWF had no claim to those assets because (1) Reed had so completely comingled his financial affairs with KWF that KWF's assets were properly part of the Estate and (2) Reed always maintained control over the assets. *KWF does not present any substantive attack on, or make any real attempt to show error in, the*

*Bankruptcy Court's analysis of these issues in its appeal*.[10]  KWF's silence in this regard speaks volumes – and leaves no doubt but that its claim to title of the assets created neither "fair doubt" nor "reasonable room for controversy" and was so "obviously insufficient … as to be plainly without color of merit."  *Harrison,* 271 U.S. at 193-95.

Moreover, this Court has reviewed the evidence in the record and concurs with the Bankruptcy Court's conclusion that there is no support for KWF's claim to title of the Turnover Assets.  The Bankruptcy Court's comprehensive survey of the evidence, as described in detail in Section II above (and as set forth in the Final Turnover Order at pp. 21-32), conclusively establishes that, in the apt words of the Bankruptcy Court, Reed used KWF as his "personal piggy bank." (Final Turnover Order, Bankruptcy Proceeding Dkt. #344 at 31.)  Given Reed's conduct, KWF's claim to the Turnover Assets is merely colorable and is not a substantial adverse claim.  Accordingly, notwithstanding KWF's claim to the assets, the Bankruptcy

---

[10] Instead, KWF focuses almost exclusively on jurisdictional and procedural attacks on the Final Turnover Order. (*See* KWF Br. on Appeal, ECF #5.)  KWF does make the point that that it is recognized as a "separate nonprofit corporation" and a "separate legal person, represented by separate counsel" (*id.* at 7, ECF #5 at 14, Pg. ID 2850), but that point says nothing about whether Reed comingled his personal financial affairs with KWF's financial affairs or whether he maintained control over the Turnover Assets.  KWF's brief on appeal also includes a single paragraph captioned "Keeper of the Word Foundation Has Established Title to its Property," (*id.* at 14, ECF #5 at 21, Pg. ID 2857), but the argument there is undeveloped and does not respond to the Bankruptcy Court's analysis on these points.

Court retained constructive possession over them and would have had summary jurisdiction (under the historical standards outlined above) to compel their surrender to the Trustee. *See Soviero, supra*.

Second, the Bankruptcy Court found that Reed always retained full control over the Turnover Assets – including, of course, when he filed for bankruptcy – and Reed's control gave the Bankruptcy Court constructive possession of those assets. *See Weidhorn*, 253 U.S. at 272; Ralph Brubaker, *The Constitutionality of Non-Article III Bankruptcy Adjudications, With and Without Litigant Consent (Part III)*, 36 Bankr. L. Letter No. 1, at 1, 9-10 (Jan. 2016). Such constructive possession would have supported the exercise of summary jurisdiction over claims to the Turnover Assets and would have authorized summary entry of an order compelling their return to the Estate.

Simply put, there is no doubt but that under the historical standards discussed above, the Bankruptcy Court would have had summary jurisdiction to enter the Final Turnover Order. It is against that background that the Court now considers whether the Bankruptcy Court had statutory and constitutional jurisdiction to adjudicate the Turnover Motion. (The Bankruptcy Court did not examine or expressly rule upon these jurisdictional questions, but the findings made by that court enable this Court to conduct the appropriate analysis.)

23

**IV**

The Court turns first to the question of whether the Bankruptcy Court exceeded its statutory jurisdiction when it entered the Final Turnover Order. The Court begins with that question because if answered in the affirmative, it would permit the Court to avoid the constitutional question. *See, e.g.*, *United States v. Elkins*, 300 F.3d 638, 647 (6th Cir. 2002) ("Courts should avoid unnecessary constitutional questions"). And the Supreme Court recently began with a statutory inquiry when facing a similar challenge to a bankruptcy court's jurisdiction. *See Stern v. Marshall* 564 U.S. 462, 475-79 (2011). For the reasons explained below, the Bankruptcy Court did not exceed its statutory jurisdiction here when it entered the Final Turnover Order.

**A**

The Bankruptcy Code recognizes two types of proceedings – "core" and "noncore" – and the distinction between the proceedings "is fundamental to a bankruptcy court's jurisdiction." *In re Bavelis*, 773 F.3d 148, 156 (6th Cir. 2014). A "core" proceeding is "one that either invokes a substantive right created by federal bankruptcy law or one which could not exist outside of the bankruptcy." *Id*. "Noncore proceedings, in contrast, are those causes of action that (1) are not identified as a core proceeding under 28 U.S.C. § 157(b)(2), (2) existed prior to the filing of the bankruptcy case, (3) would continue to exist independent of the

24

provisions of Title 11 of the United States Code, and (4) are not significantly affected as a result of the filing of the bankruptcy case." *Id*.

As the United States Court of Appeals for the Sixth Circuit has explained, the core/noncore classification governs the extent of a bankruptcy court's statutory jurisdiction to enter final orders:

> Congress has granted bankruptcy judges differing authority depending on whether the claim is "core" or "noncore." 28 U.S.C. § 157. In core proceedings, a bankruptcy judge "may enter appropriate orders and judgments" subject to appellate review by the district court. *Id.* § 157(b)(1). In noncore proceedings, on the other hand, the bankruptcy judge "shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after ... reviewing de novo" the objections of either party. *Id.* § 157(c)(1).

*Id.* Here, then, the Bankruptcy Court had statutory jurisdiction to enter the Final Turnover Order if and only if the turnover proceedings were "core." They were.

**B**

There were, in effect, two components to the turnover proceedings before the Bankruptcy Court. The first component consisted of the court determining "whether" the Turnover Assets were "in, fact, part of" the Estate. (Final Turnover Order, Bankruptcy Proceeding Dkt. #344 at 1.) The second component was the order requiring surrender of the Turnover Assets to the Trustee. (*See id.* at 32-33.) Both fell with the court's core jurisdiction.

To begin, there is no doubt that a bankruptcy court has core jurisdiction to determine what constitutes property of the estate. Indeed, "[i]t is well established that proceedings to determine what constitutes property of the bankruptcy estate under section 541(a) of the Bankruptcy Code are core proceedings." *In re AGR Premier Consulting, Inc.*, 550 Fed. App'x 115, 122 (3d Cir. 2014).[11] Moreover, there is strong historical support for treating proceedings to determine what constitutes estate property as core under the Bankruptcy Code. As noted above, "[i]dentifying property that constitutes the estate has long been a central feature of bankruptcy adjudication," *Sharif*, 135 S.Ct. at 1952 (Roberts, C.J., dissenting), and Congress intended the term "core" to include proceedings "that fell within the scope of the historical bankruptcy court's power." *Arkison*, 134 S.Ct. at 2172,

---

[11] See also *In re Reliance Grp. Holdings, Inc.*, 273 B.R. 374, 395 (Bankr. E.D. Pa. 2002) ("a determination of what is property of the estate … is precisely the type of proceeding over which the bankruptcy court has exclusive [core] jurisdiction.") (quoting *All American Laundry Service v. Ascher*, 128 B.R. 639, 643 (Bankr. N.D.Ill. 1991)); *In re Pali Holdings, Inc.*, 488 B.R 841, 848-49 (Bankr. S.D.N.Y. 2013) (determination of whether property is part of a bankruptcy estate remains a "core" proceeding after *Stern* decision). The determination of property that belongs to the estate is a core function "even though such a determination may rest upon interpretation of state law." *In re Reliance Grp. Holdings*, 273 B.R. at 395; *see also In re Touch America Holdings, Inc.*, 401 B.R. 107, 117 (Bankr. D. Del. 2009) ("A proceeding to determine whether certain property rights are 'property of the estate' under Bankruptcy Code § 541 is a core proceeding, even if the determination rests upon interpretation of state law") (quoting *Reliance Grp. Holdings*, 273 B.R. at 394-95); *In re Grubb & Ellis Co.*, 523 B.R. 423, 440 (Bankr. S.D.N.Y. 2014) (same).

Thus, the Bankruptcy Court performed a core function when it analyzed whether the Turnover Assets belonged to the Estate and ruled that they did.

The entry of the Final Turnover Order requiring surrender of the Turnover Assets was likewise a core proceeding. A federal statute provides examples of such proceedings, and that statute identifies "orders to turn over property of the estate" as core proceedings. 28 U.S.C. § 157(b)(2)(E). The Final Turnover Order was just such an order: it required KWF to turn over property that belonged to the Estate. The Final Turnover Order thus fit comfortably within the class of core proceedings identified in 28 U.S.C. 157(b)(2)(E). *See, e.g.*, *In re Glenn*, 359 B.R. 200, 204 (Bankr. N.D. Ill. 2006) ("Requests for turnover orders are core proceedings within the jurisdiction of the bankruptcy courts").

KWF counters that the turnover proceedings were not core because it (KWF) disputed title to the Turnover Assets. It is easy to see why KWF makes this argument. There is ample authority for the proposition that a bankruptcy trustee's request for "turnover of assets whose title is in dispute … can only constitute, at the most, noncore rather than core proceedings … [under] 28 U.S.C. § 157(b)(2)(E)." *In re Allegheny Health Educ. and Research Foundation*, 233 B.R. 671, 677 (Bankr. W.D. Pa. 1999). As one federal court has explained, where an "ownership dispute must be resolved before any relief can be ordered, the proceeding is a non-core replevin action under state law rather than a [core]

turnover proceeding." *In re General Media*, 335 B.R. 66, 76 (Bankr. S.D.N.Y 2005). This rule appears to rest on the notion that where there is a dispute over title, the assets in question cannot properly be treated as "property of the estate" under 28 U.S.C. § 157(b)(2)(E).

But not every "dispute" over title converts what would otherwise be a core turnover proceeding into a noncore one. Only a *legitimate* or *bona fide* dispute over title does so. *See Acolyte Elec. Corp. v. City of New York*, 69 B.R. 155, 173 (Bankr. E.D.N.Y. 1986) (explaining that a turnover action "does not constitute a core proceeding under § 157(b)(2)(E)" when there is "a bona fide dispute" or a "legitimate dispute" as to debtor's right to the property). A dispute that is not legitimate does not create sufficient doubt as to whether the assets in question are "property of the estate" so as to remove a turnover action from § 157(b)(2)(E).

The analysis is much like that described above under the 1898 Act. Just as a merely "colorable" claim to title by a third party did not deprive a bankruptcy court of constructive possession of, and summary jurisdiction over, property involved in a turnover action under that Act, *see* above at section III(B), a wholly insubstantial claim of title by a third party today does not divest a bankruptcy court of its core turnover jurisdiction.[12] As one court has explained, "bankruptcy courts under the

---

[12] Allowing a third party to strip a bankruptcy court of its core turnover jurisdiction by asserting an entirely baseless claim to title would substantially interfere with the efficient administration of bankruptcy estates.

1898 Act could exercise summary jurisdiction over turnover claims when the defenses to such claims were not 'real and substantial,' [and] they can do the equivalent of that now." *In Re Pali Holdings, Inc*., 488 B.R 841, 854 and n. 43 & 45 (Bankr. S.D.N.Y 2013).  Simply put, "the principles applicable to determine jurisdiction over turnover actions under the 1898 [Act] remain 'perfectly appropriate to distinguish between a 'core' turnover proceeding and a 'non-core' [one]," *In Re Prosser,* 2013 WL 996367, at *4 (Bankr. D.V.I 2013) (quoting *Beard v. Braunstein,* 914 F.2d 434, 444 (3d Cir. 1990)),[13] and under those "principles," the entry of the Turnover Order must be deemed a core proceeding because KWF's claim to the Turnover Assets was and is entirely baseless.

## V

## A

Article III, Section 1 of the Constitution provides that "[t]he judicial power of the United States, shall be vested in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1.  Congress has created more than 100 Article III courts, including 94 District Courts and 13 Courts of Appeals. *See Sharif*, 135 S.Ct. at 1938.  Judges on

---

[13] While Congress eliminated the summary/plenary line in the Bankruptcy Reform Act of 1978, *see In re Aurora Cord and Cable Co. Inc.*, 2 B.R. 342, 344  (Bankr. N.D. Ill. 1980), the Bankruptcy Amendments and Federal Judgeship Act of 1984 made that distinction relevant again by using the term "core" to track the historical jurisdiction of bankruptcy courts to enter final orders. *See Arkison*, 134 S.Ct. at 2171 n. 7.

these Article III courts have "life tenure and pay that cannot be diminished." *Id.*
"[T]hese protections help to ensure the integrity and independence of the
Judiciary," and for that reason the Supreme Court has long held "'that, in general,
Congress may not withdraw from' the Article III courts 'any matter which, from its
nature, is the subject of a suit at the common law, or in equity, or in admiralty.'"
*Id.* (quoting *Stern*, 564 U.S. at 484.)

Congress has also created bankruptcy courts "to assist Article III courts in
their work." *Id.* Judges on bankruptcy courts perform work that is essential to the
effective functioning of the federal judicial system, but they "do not enjoy the
protections of Article III." *Id.* Congress' efforts to assign powers to bankruptcy
courts in a manner consistent with Article III "have not always been successful."
*Id.* at 1939. Indeed, the Supreme Court has twice "held that Congress violated
Article III by authorizing bankruptcy judges to decide certain claims for which
litigants are constitutionally entitled to an Article III adjudication." *Id.*

The Supreme Court's precedents in this area distinguish between claims
involving "private rights" and those involving "public rights." *See Waldman v.
Stone*, 698 F.3d 910, 918 (6th Cir. 2012). "Private rights" have been "historically
described as 'the liability of one individual to another under the law as defined,'"
and the adjudication of these rights "is part of the judicial Power reserved to
Article III courts under the Constitution." *Id.* (quoting *Stern*, 564 U.S. at 489). The

30

Supreme Court has not offered a single, all-encompassing definition of "public rights," but it has "limit[ed]" such rights to claims that "derive[] from a federal regulatory scheme, or in which resolution of the claim by an expert government agency is deemed essential to a limited regulatory objective within the agency's authority." *Stern*, 564 U.S. at 490. "[W]hat makes a right 'public' rather than private is that the right is integrally related to particular federal government action." *Id.* Claims involving the adjudication of public rights "may be removed from the jurisdiction of Article III courts" and assigned to bankruptcy courts. *Arkison*, 134 S.Ct. at 2171; *Waldman*, 698 F.3d at 918.

The Supreme Court has not definitively ruled on whether the "public rights" exception to Article III applies when a bankruptcy court performs a function that lies at the very heart of historical bankruptcy jurisdiction. But the Court has "initimat[ed]" that the exception does apply in these circumstances. *Waldman*, 698 F.3d at 920. For instance, in *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), a plurality of the Supreme Court suggested that matters invoking "'the core of the federal bankruptcy power' … 'may well be' a matter of public right." *Id.* (quoting *Northern Pipeline*, 458 U.S. at 71-72.) Likewise, in *Arkison*, the Supreme Court continued to recognize the constitutional significance of the distinction between the adjudication of matters at the "core" of the

bankruptcy power and the adjudication of "state-created private rights." *Arkison*,

134 S.Ct. at 2171 (quoting *Northern Pipeline*, 458 U.S. at 71-72.)

And there is strong reason to believe that a bankruptcy court may adjudicate

a claim lying at the heart of historical bankruptcy jurisdiction even if the claim

does not fit neatly into the "public rights" rubric. As Chief Justice Roberts has

explained, the Supreme Court's "precedents" have "recognized" a historically-

based "exception to the requirements of Article III for certain bankruptcy

proceedings":

> When the Framers gathers to draft the Constitution,
> English statutes had long empowered nonjudicial
> bankruptcy 'commissioners' to collect a debtor's
> property, resolve claims by creditors, order the
> distribution of assets in the estate, and ultimately
> discharge the debts. This historical practice, combined
> with Congress's constitutional authority to enact
> bankruptcy laws, confirms that Congress may assign to
> non-Article courts adjudications involving 'the
> restructuring of debtor-creditor relations, which is at the
> core of the federal bankruptcy power.'

*Sharif*, 135 S.Ct. at 1951 (Roberts, C.J. dissenting) (internal citation omitted)

(quoting *Northern Pipeline*, 458 U.S. at 71). This exception exists separate and

apart from the public rights exception. *See id.* (distinguishing between the two

different exceptions).

Professor Brubaker's influential scholarship echoes the Chief Justice's view

that the Supreme Court's most recent Article III precedents permit a bankruptcy

court to adjudicate a claim within the core of historical bankruptcy jurisdiction. Professor Brubaker explains that the Supreme Court "has simply confirmed the constitutional significance of the longstanding, fundamental, historical distinction between 'summary' matters of estate and case administration, appropriate for final adjudication by a non-Article III arbiter …[and] 'plenary' suits by the bankruptcy estate's representative to recover money or property from an 'adverse claimant,' in which individual litigants have a constitutional right to final judgment from an Article III judge." Brubaker, 36 Bankr. L. Letter at 1, 1-2.[14]

All of this convinces this Court that Article III "poses no barrier" to a bankruptcy court's "resolution" of a "claim" that fits comfortably within the historically-recognized heart of bankruptcy jurisdiction. *Sharif*, 135 S.Ct. at 1952 (Roberts, C.J., dissenting). A bankruptcy court may adjudicate such a claim because it falls within either the public rights exception to Article III or the independent exception to Article III for proceedings within the heart of longstanding bankruptcy jurisdiction.

## B

The Chief Justice's Opinion in *Sharif* confirms that the Bankruptcy Court did not violate Article III by entering the Turnover Order because the entry of that order was fully consistent with the historical exercise of core bankruptcy

---

[14] This article is attached as "Exhibit F" to Professor Brubaker's amicus brief in this action. (*See* ECF #34 at 97-112, Pg. ID 3278-93.)

jurisdiction.  The facts of *Sharif* are much like those here, and the Chief Justice's analysis of the Article III issue presented there fits this case like a glove.

In *Sharif,* a creditor alleged that the debtor "had concealed about $5 million of assets by claiming that they were owned by a trust" for which he served as the trustee. *Id.* at 1952.  The creditor sought a declaratory judgment "that the trust was in fact [the debtor's] alter ego and that its assets should accordingly be part of his bankruptcy estate." *Id.*  The bankruptcy court entered "a final judgment (based on default) to [the creditor], declaring that the trust assets were part of the [debtor's] estate because he had treated them as his own property." *Id.*  On appeal, the creditor argued that Article III prevented the bankruptcy court from entering the judgment.  The Chief Justice disagreed.

The Chief Justice carefully reviewed the historical bankruptcy practice described in detail in parts III(A)-(C) above and concluded that identifying property of a debtor's estate is and always has been "peculiarly a bankruptcy power." *Id.* at 1952.  He added that a bankruptcy court's power to gather assets in the debtor's actual or constructive possession "stem[med] not from any independent source of law but from the bankruptcy itself." *Id.* (citing *Stern*, 564 U.S. at 499-500).  And the Chief Justice stressed that under the 1898 Act the Supreme Court repeatedly allowed bankruptcy courts, in the exercise of their summary jurisdiction, to bring property in the debtor's possession into the estate,

"at least where [as in this case] no third party asserted a 'substantial adverse' claim." *Id.* at 1953.

The Chief Justice also drew heavily upon *Sampsell*, *supra*, highlighting that "[j]ust as the bankruptcy referee in that case had authority to decide whether assets allegedly concealed behind the corporate veil belonged to the bankruptcy estate, the Bankruptcy Court here had authority to decide whether the assets concealed in the trust belonged to Sharif's estate." *Id.*

To underscore this point, the Chief Justice contrasted the bankruptcy court's gathering of assets from a debtor's alter ego with a bankruptcy court's adjudication of a fraudulent conveyance claim:

> Sharif contends that Wellness's alter ego claim is more like an allegation of a fraudulent conveyance, which this Court has implied must be adjudicated by an Article III court. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989); *Arkison*, 573 U.S., at ——— – ———, 134 S.Ct., at 2172–2173. Although both actions aim to remedy a debtor's deception, they differ in a critical respect. A fraudulent conveyance claim seeks assets in the hands of a third party, while an alter ego claim targets only the debtor's "second self." Webster's New International Dictionary 76 (2d ed. 1954). That distinction is significant given bankruptcy's historic domain over property within the actual or constructive "possession [of] the bankrupt at the time of the filing of the petition." *Thompson v. Magnolia Petroleum Co.*, 309 U.S. 478, 481, 60 S.Ct. 628, 84 L.Ed. 876 (1940). Through a fraudulent conveyance, a dishonest debtor relinquishes possession of assets before filing for bankruptcy. Reclaiming those assets for the estate requires depriving third parties of property within their

otherwise lawful possession and control, an action that "quintessentially" required a suit at common law. *Granfinanciera*, 492 U.S., at 56, 109 S.Ct. 2782. By contrast, a debtor's possession of property provided "an adequate basis" for a bankruptcy referee to adjudicate a dispute over title in a summary proceeding. *Thompson*, 309 U.S., at 482, 60 S.Ct. 628; *see Mueller*, 184 U.S., at 15–16, 22 S.Ct. 269 (distinguishing claim to property in possession of debtor's agent from fraudulent conveyance claim in determining that bankruptcy referee could exercise summary jurisdiction).

In sum, unlike the fraudulent conveyance claim in *Granfinanciera*, Wellness's alter ego claim alleges that assets within Sharif's actual or constructive possession belong to his estate. And unlike the breach of contract and tort claims at issue in *Northern Pipeline* and *Stern*, Wellness's claim stems not from any independent source of law but "from the bankruptcy itself." *Stern*, 564 U.S., at ——, 131 S.Ct., at 2618. Provided that no third party asserted a substantial adverse claim to the trust assets, Wellness's claim therefore falls within the narrow historical exception that permits a non-Article III adjudicator in certain bankruptcy proceedings.

*Id.* at 1953-54.

The Chief Justice's analysis applies with full force here. As in *Sharif*, the Bankruptcy Court here exercised its longstanding historical authority – which, again, exists independent of state law – to identify property in the debtor's (Reed's) constructive possession and to bring that property into the Estate. The Bankruptcy Court properly exercised this power because neither KWF nor any other party asserted a "substantial adverse" claim to the Turnover Assets. Like the Chief Justice, this Court "do[es] not read the [Supreme] Court's precedents to

36

require the bankruptcy courts to abandon this power, which they have exercised for [at least one] centur[y].” *Waldman*, 698 F.3d at 920-21.  Article III did not prevent the Bankruptcy Court from entering the Final Turnover Order.

## VI

Even if the Bankruptcy Court lacked statutory and constitutional authority to enter the Final Turnover Order, the Court would still not grant KWF relief on appeal.  Instead, the Court would exercise its authority to treat the Final Turnover Order as “proposed findings of fact and conclusions of law” with respect to the issues raised in the Turnover Motion. *See* 28 U.S.C. § 157(c)(1) (allowing “bankruptcy judge [t]o hear a proceeding that is not a core proceeding” and to “submit proposed findings of fact and conclusions to law to district court”); *see also Arkison*, 134 S.Ct. 2175 (holding that “even if … Bankruptcy Court’s entry of judgment was invalid” and was not designated as proposed findings of fact and conclusions of law, “the District Court’s *de novo* review and entry of its own valid final judgment cured any error”).

Here, the Court has conducted such a *de novo* review of the Final Turnover Order and the parties’ respective arguments with respect to the Turnover Assets.  It concludes that, for all of the reasons persuasively explained by the Bankruptcy Court in the Final Turnover Order, (1) the record evidence conclusively establishes that KWF has no viable claim to ownership of the Turnover Assets, (2) the assets

belong to the Estate, and (3) the assets must be turned over to the Trustee. Accordingly, in the alternative to its conclusion that the Bankruptcy Court had jurisdiction to enter the Final Turnover Order, the Court treats the Final Turnover Order as proposed findings of fact and conclusions of law and adopts the same as the final judgment of this Court in favor of the Trustee.

## VII

KWF argues that the Bankruptcy Court made an additional and independent error when it adjudicated the dispute over title to the Turnover Assets in the context of a contested motion under Section 542(a) rather than in an adversary proceeding. KWF has failed to persuade the Court that the Bankruptcy Court erred in this regard. And even if the court did so err, the error was harmless.

## A

"Disputes litigated in the bankruptcy court are divided into adversary proceedings and contested matters." *In re Indian Palms Associates, Ltd.*, 61 F.3d 197, 204 n.11 (5th Cir. 1995). Contested matters are "generally initiated by motion and do not require a responsive pleading (unless the bankruptcy court directs that an answer be served)." *Id.* On the other hand, adversary proceedings "are governed by more formal rules of procedure than contested matters and must be instituted by the filing of a complaint. Pursuant to Chapter VII of the Bankruptcy

Rules, many of the Federal Rules of Civil Procedure are applicable and these proceedings are thus conducted much like ordinary civil litigation." *Id.*

"Bankruptcy Rule 7001 identifies matters that constitute adversary proceedings governed by the rules of Part VII of the Bankruptcy Rules." *In re MF Global Inc.*, 531 B.R. 424, 431 (Bankr. S.D.N.Y. 2015). That rule's list of adversary proceedings includes "a proceeding to recover money or property, *other than a proceeding to compel the debtor to deliver property to the trustee*, or a proceeding under § 554(b) or § 725 of the Code." Fed. R. Bankr. P. 7001(1) (emphasis added). Under this rule, then, an action to recover money or property from a third party must be brought as an adversary proceeding; an action to recover money or property from the debtor may be brought as a contested matter.

KWF argues that Rule 7001 required the Bankruptcy Court to adjudicate the dispute over title to the Turnover Assets in an adversary proceeding because the Trustee sought to recover property not from the debtor (Reed), but, instead, from a third party (KWF). In support of this argument, KWF cites several cases in which courts have held that a request for the turnover of property must be litigated by adversary proceeding (and not in a contested motion) where there is a dispute over ownership of the property between the debtor and a third party. *See*, *e.g.*, In re *Ace Industries*, 65 B.R. 199 (Bankr. W.D. Mich. 1986) (requiring debtor to file

39

adversary proceeding where ownership of property was in dispute); *In re Riding*, 44 B.R. 846 (Bankr. D. Utah 1984) (same).

But there is a real question as to whether Rule 7001 or the cases cited by KWF apply here. As explained in detail above, the evidence overwhelmingly establishes that Reed had so commingled his own affairs with KWF that there was no distinction between the two. Thus, even though the Turnover Motion was nominally directed at KWF, it could reasonably be seen as "a proceeding to compel *the debtor* to deliver property to the trustee," which need not take the form of an adversary proceeding. Fed. R. Bankr. P. 7001(1) (emphasis added). Likewise, the cases cited by Reed are distinguishable because they involved legitimate or *bona fide* disputes over title, and, as described above, there was no such dispute here.

Finally, KWF argues that it was entitled to an adversary proceeding because the Trustee was seeking to recover under a fraudulent conveyance theory. (*See* KWF Br. on Appeal at 12-13, ECF #5 at 19-20, Pg. ID 2855-56, citing advisory committee notes to Bankruptcy Code.) But the Trustee did *not* advance a fraudulent conveyance theory in the Turnover Motion. While the Trustee did assert a fraudulent conveyance claim in the related Adversary Proceeding, the Turnover Motion did not include a fraudulent conveyance theory. As the Bankruptcy Court explained, in the Turnover Motion, "the Trustee [did not seek]

40

recovery from KWF as the recipient of a fraudulent transfer. Instead, the Trustee argu[ed] that Reed's failure to segregate his personal affairs from those of KWF [was] grounds for treating property held by KWF as property of Reed's bankruptcy estate." (Final Turnover Order, Bankruptcy Proceeding Dkt. #344 at 30-31.) Thus, because the Trustee did not proceed on a fraudulent conveyance theory in the Turnover Motion, KWF was not entitled to have the claims raised in that motion adjudicated in an adversary proceeding.

For all of these reasons, KWF has not persuaded the Court that the Bankruptcy Court erred when it adjudicated the Turnover Motion in the underlying Bankruptcy Proceeding instead of in the related Adversary Proceeding.

## B

Even if the Bankruptcy Court erred when it adjudicated the dispute over title to the Turnover Assets by way of a contested motion rather than in an adversary proceeding, KWF still would not be entitled to relief. It is well-established that the erroneous failure to conduct an adversary proceeding is subject to harmless error review, and any error here was harmless.

The Sixth Circuit's decision in *In re Cannonsburg Environmental Associates, Ltd.*, 72 F.3d 1260 (6th Cir. 1996), is instructive. In *Cannonsburg*, the Sixth Circuit held that even though the "Federal Rules of Bankruptcy Procedure clearly mandate[d]" that "an adversary proceeding should have been filed," the

41

error was not a basis for relief because it was "harmless." *Id.* at 1264. The Sixth Circuit declined to grant relief because the appellant could not "demonstrate that it ha[d] been prejudiced by the [t]rustee's failure to file an adversary proceeding." *Id.* *See also In re Service Merchandise Co., Inc.*, 256 B.R. 755, 766 (Bankr. M.D. Tenn. 2000) ("[U]nless the party is able to demonstrate prejudice by the failure to file an adversary proceeding, a court will find the error constitutes harmless error").

Here, KWF has failed to demonstrate that it suffered any meaningful prejudice from the Bankruptcy Court's decision to proceed by motion rather than in an adversary proceeding. The Bankruptcy Court provided KWF with many procedural protections like those that KWF would have enjoyed if the court had conducted an adversary proceeding:

- The Bankruptcy Court allowed KWF three weeks to respond to the Turnover Motion, which included an additional week to respond that KWF requested by stipulation. (*See* Bankruptcy Proceeding Dkt. #157.)
- The Bankruptcy Court held a hearing on the Turnover Motion on July 21, 2016, at which it heard legal argument from KWF. (*See* Bankruptcy Proceeding Dkt. #210.)
- After the July 21st hearing, the Bankruptcy Court concluded that it needed additional briefing and hearing on the issues related to whether assets that supposedly belonged to KWF were, "in fact, assets of [Reed's] bankruptcy estate." (Final Turnover Order, Dkt. #344 at 1.) It then provided KWF nearly three months to prepare for an evidentiary hearing on that issue.

- The Bankruptcy Court held a substantial evidentiary hearing over three days during which KWF was free to (and did) present evidence and examine witnesses.

- Finally, the Bankruptcy Court allowed KWF to file a supplemental brief following the conclusion of the evidentiary hearing. (*See* Bankruptcy Proceeding Dkt. #320.)

Given all of these procedural protections that the Bankruptcy Court provided KWF in this case, KWF did not suffer any prejudice as a result of the Bankruptcy Court's decision to proceed by way of contested motion in the Bankruptcy Proceeding.

KWF's primary claim of prejudice is that the Bankruptcy Court's decision to proceed by motion rather than in an adversary proceeding purportedly allowed both that court and the Trustee to change the theory of the case during the course of the litigation. More specifically, KWF complains that while the Turnover Motion was premised upon the theory that the Turnover Assets belonged to the Estate, the Bankruptcy Court and the Trustee improperly and without appropriate notice injected a fraudulent conveyance theory of recovery into the proceedings, thereby "shift[ing] the grounds for [the Bankruptcy Court's] inquiry." (KWF Supp. Br. at 8, ECF #25 at 13, Pg. ID 3136.) KWF insists that this theory-change-on-the-fly (so to speak) could not have occurred in an adversary proceeding because the disputed issues in such a proceeding are formally framed by pleadings that must

comply with, and may only be amended in accordance with, the Federal Rules of Civil Procedure.

KWF is correct that during adjudication of the Turnover Motion, the Bankruptcy Court did introduce the possibility that it would inquire into whether the Turnover Assets had been fraudulently transferred to KWF. (*See* Bankruptcy Court July 22, 2015, Order, Bankruptcy Proceeding Dkt. #186 at 3.)  But the Bankruptcy Court later decided that the proceedings would *not* involve any claim of fraudulent conveyance.  As the Bankruptcy Court explained in the Final Turnover Order, the evidentiary hearing focused on whether the Turnover Assets belong to the Estate, not on whether those assets had been fraudulently transferred to KWF. (*See* Final Turnover Order, Bankruptcy Proceeding Dkt. #344 at 26-32.) More importantly, the Final Turnover Order did *not* grant relief to the Trustee on a fraudulent conveyance theory.  Instead, the Bankruptcy Court ordered KWF to surrender the Turnover Assets based upon "Reed's failure to segregate his personal affairs from those of KWF." (*Id.* at 30-31.)  Thus, even though the Bankruptcy Court temporarily considered a fraudulent conveyance theory during the contested motion proceedings, that consideration did not end up causing KWF any real harm. Accordingly, KWF has failed to show that it suffered meaningful prejudice when the Bankruptcy Court adjudicated the dispute over the Turnover Assets in the context of a contested motion rather than through an adversary proceeding.

44

## VIII

Finally, KWF argues that the Bankruptcy Court's entry of the Final Turnover Order violated its (KWF's) Seventh Amendment right to a jury trial.  The Court disagrees.

## A

As Professor Brubaker has explained, the Supreme Court "fully equat[es] bankruptcy litigants' Seventh Amendment right to a jury trial in federal bankruptcy proceedings with their right to a final judgment from an Article III judge." Brubaker, Am. Bankr. L.J. at 150-51.  Professor Brubaker rests this conclusion primarily upon the Supreme Court's decisions in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) and *Stern, supra*. *See* Brubaker, Am. Bankr. L.J. at 150-51.  In *Granfinanciera*, the Supreme Court explained that "if Congress may assign the adjudication of a statutory cause of action to a non-Article III tribunal, then the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder." *Granfinanciera*, 492 U.S. at 52-54.  And in *Stern*, the Supreme Court "relied directly (and without qualification) upon Seventh Amendment jury trial decisions (in *Granfinanciera*, *Katchen* [*supra*], and *Langenkamp v. Culp* [498 U.S. 42 (1990)]) as if they were binding precedent for purposes of the Article III decision … systematically describing, paraphrasing, or recasting language, analysis, conclusions, and holdings from those decisions in

45

Article III terms." Brubaker, 86 Am. Bankr. L.J. at 151.  From *Granfinanciera* and *Stern*, Professor Brubaker concludes that a bankruptcy litigant who has no "right to a final judgment from an Article III judge" has no Seventh Amendment right to a jury trial. *Id.*  This Court agrees.

KWF insists that it did have a right to a jury trial because (1) *Granfinanciera* held that a defendant has a Seventh Amendment right to a jury trial on a fraudulent conveyance claim and (2) the Trustee here sought recovery of the assets on a fraudulent conveyance theory.  But as noted above, the Turnover Motion did not include, and the Final Turnover Order did not rest upon, a fraudulent conveyance theory.  Moreover, as Chief Justice Roberts explained in the passage from *Sharif* quoted above, (1) there are important differences between an action by a trustee seeking assets on a comingling theory and one seeking assets on a fraudulent conveyance theory and (2) given those differences, a comingling claim is not subject to the same constitutional constraints as a fraudulent conveyance claim. *See Sharif*, 135 S.Ct. at 1953-54 (Roberts, C.J., dissenting).

In sum, because KWF had no right to a final judgment from an Article III judge, it likewise had no right to a jury trial.

**B**

In the alternative, KWF is not entitled to relief because there is no Seventh Amendment right to a jury trial in turnover proceedings under Section 542(a) where, as here, there is no legitimate dispute over title.[15]

The decision of the United States Court of Appeals for the First Circuit in *Braunstein v. McCabe*, 571 F.3d 108 (1st Cir. 2009), is particularly instructive in this regard. In *Braunstein*, the First Circuit carefully surveyed the history and nature of turnover proceedings and the turnover remedy and concluded that they do not fall within the Seventh Amendment jury trial guarantee. The First Circuit explained that a turnover action "invokes the court's most basic equitable powers to gather and manage property of the estate" and therefore does not require a jury trial. *Id.* at 122. Moreover, the *Braunstein* court correctly concluded that the "enactment of [Section 542(a)] "did not alter the essentially equitable nature of those powers to collect the assets of the estate." *Id.* at 121. And because that power is equitable, it does not require a trial by jury. *See id.* This Court concurs with the First Circuit and believes that the reasoning set forth in *Braunstein* underscores that the Seventh Amendment right to trial by jury does not attach to a turnover proceeding, like the one in this appeal, in which there is no *bona fide* dispute as to ownership of the assets in question.

---

[15] This conclusion is a separate and wholly independent basis for denying KWF relief from the Court's holding in section VIII(A) above.

## IX

For the reasons stated above, **IT IS HEREBY ORDERED** that the Final Turnover Order is **AFFIRMED.**  In the alternative, the Court treats the Final Turnover Order as Proposed Findings of Fact and Conclusions of Law, **ADOPTS** the Final Turnover Order as its own Findings of Fact and Conclusions of Law, and **GRANTS** the Turnover Motion.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  October 11, 2016


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on October 11, 2016, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113